UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CERCO BRIDGE LOANS 6 LLC,<br><br>                              Plaintiff,<br><br>                    v.<br><br>GREGG SCHENKER and STEVEN HORNSTOCK,<br><br>                              Defendants. | 23 Civ. 11093 (DEH)<br><br>**OPINION AND ORDER** |

DALE E. HO, United States District Judge:

Plaintiff Cerco Bridge Loans 6 LLC ("Plaintiff," "Lender," or "Cerco") brings claims against Defendants Gregg Schenker and Steven Hornstock ("Defendants" or "Guarantors") for breach of contract, breach of the implied covenant of good faith and fair dealing, and a declaratory judgment, all in connection with a commercial real-estate loan.  The parties dispute the legal interpretation of a personal guaranty made by Defendants in connection with the loan: Plaintiff asserts that the guaranty requires Defendants to pay the entire outstanding balance on the loan, while Defendants argue that the guaranty is more limited in scope and the conditions for liability have not been met.

For the reasons that follow, the Court concludes that Defendants have the correct interpretation of the guaranty, as is clear from Plaintiff's pleadings alone.  Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss the First Amended Complaint, ECF No. 39. Because the Court dismisses all claims, it **DENIES** as moot Plaintiff's Cross-Motion for Partial Summary Judgment, ECF No. 45.  Finally, the court **GRANTS IN PART** Defendants' Motions for Discovery Sanctions, ECF Nos. 78, 113.

## BACKGROUND

Except where otherwise noted, the following facts are taken from Plaintiff's First Amended Complaint ("FAC"), ECF No. 23, and attached exhibits.  Plaintiff's allegations are accepted as true solely for the purpose of adjudicating the Motion to Dismiss.

### A.  The Parties

Cerco is a limited liability company that originates short-term commercial real-estate loans.  FAC ¶¶ 2, 16.  Its single member, Cerco Capital Inc., is a Delaware corporation with a principal place of business in the Bahamas.  FAC ¶¶ 16-17.  Defendants are two adult individuals who are citizens of the State of New York.  FAC ¶¶ 18-19.  Together with two non-parties, AEW Partners Real Estate Fund VIII, L.P. and Earlin Investment L.P., Defendants agreed to a Guaranty of Recourse Obligations ("Guaranty") in connection with the commercial real-estate loan at issue in this dispute.  FAC ¶¶ 20, 33.

### B.  The Ground Lease

Defendant Schenker is the manager of non-party P8 ABS-EE 695 Lex Leaseco, LLC ("Borrower," "P8," or "Tenant").  FAC ¶ 8.  In 2019, P8 signed a 99-year lease (the "Ground Lease") for the parcel of land and mixed-use commercial and office building located at 136 East 57th Street in New York City (the "Property").  FAC ¶ 27; *id.* Ex. 2 ("Ground Lease Part I") at 2-4, ECF No. 23-3.  P8 leased the Property from Silk & Halpern 57, LLC ("Silk & Halpern" or "Landlord").  FAC ¶ 27.  The Ground Lease provides that P8 shall pay Silk & Halpern "an annual basic net rent in quarterly installments, in advance, on the first day of each quarter" during the term of the lease.  FAC ¶ 28; *id.* Ground Lease Part I § 5.

The Ground Lease also expressly contemplates the possibility of P8's entering into a leasehold mortgage (i.e., a loan secured by the leasehold estate)—as P8 did when it took the loan from Cerco (here, the "Leasehold Mortgagee").  *See* Ground Lease Part I § 15(a)(i); FAC ¶ 29;

*id.* Exs. 3A & 3B.  Recognizing the security interest the Leasehold Mortgagee has in the continuance of the lease, the Ground Lease ensures that the Mortgagee has notice of any default and the right to cure it before steps are taken to terminate the lease.  Ground Lease Part I § 15(a)(ii).  Specifically, in the event of a default by Tenant, "Landlord shall give written notice thereof to any Leasehold Mortgagee . . . and Landlord shall take no action to terminate this Lease" provided that the Leasehold Mortgagee cures the default.  *Id.*  If the default takes the form of a missed rent payment, the Leasehold Mortgagee has the right to cure that default within fifteen days after the Tenant's cure period ends, or within fifteen days after the Leasehold Mortgagee receives notice of the default, whichever is later.  *Id.*  "Landlord and Tenant will not surrender, accept a surrender of, abandon, reject, materially modify or amend this Lease . . . , subject to the cure rights granted in this Lease to a Leasehold Mortgagee."  *Id.* § 15(a)(i).  But if the Leasehold Mortgagee fails to cure a default "within the time period and in the manner so required above, then the Leasehold Mortgagee shall be deemed to have waived any right to cure and this Lease shall be deemed terminated" upon the expiration of the Leasehold Mortgagee's cure period.  *Id.* § 15(a)(ii).

### C.  The Loan and the Guaranty

On March 8, 2022, Cerco made a loan of $23,500,000 (the "Loan") to P8 to finance, among other things, "tenant improvements, real estate brokerage, and capital expenditure improvement costs" for the Property.  FAC ¶ 3.  The Loan consisted of $13,200,000 secured by a leasehold mortgage and $10,300,000 secured by a building mortgage.  FAC ¶ 3.  The Loan was evidenced by a bundle of documents collectively referred to as the "Loan Documents": a Leasehold Mortgage Note and Leasehold Mortgage, *see* FAC Exs. 3A & 3B, ECF Nos. 23-6 & 23-7; a Building Note and Building Mortgage, *see* FAC Exs. 4A & 4B, ECF Nos. 23-8 & 23-9;

and a Building Loan Agreement, *see* FAC Ex. 5, ECF No. 23-10.  The Loan Documents provide that:

> Upon the occurrence of any Event of Default beyond all applicable cure periods, the entire unpaid principal sum hereunder plus all interest accrued thereon plus all other sums due and payable to Lender hereunder and/or under the Loan Documents shall, at the sole option of Lender, become due and payable immediately without presentment, demand, notice of nonpayment, protest, notice of protest or other notice of dishonor, all of which are hereby expressly waived by Borrower. Notwithstanding the foregoing, Borrower has the right to cure the same prior to Lender declaring the acceleration of any of the debt.

Leasehold Mortgage Note § 12(a); Building Mortgage Note § 12(a).[1]  The Loan's maturity date is March 7, 2025.  FAC ¶ 3d.

As a condition of making the loan to P8, Cerco required Guarantors to sign a Guaranty of Recourse Obligations (the "Guaranty").  FAC ¶ 4; *see* FAC Ex. 1 ("Guaranty"), ECF No. 23-2. Guarantors acknowledged that they would "materially benefit from Lender's agreement to make the Loan."  Guaranty at 2.  The relevant sections of the Guaranty provide:

> Section 1.1    Guaranty of Obligations.  Guarantors hereby irrevocably and unconditionally guaranty to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations (as defined in Section 1.2, below) as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise, subject to and in accordance with the limitations set forth in this Guaranty.  Guarantors hereby irrevocably and unconditionally covenant and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

> Section 1.2    Definition of Guaranteed Obligations.

> (a) Guarantors hereby assume liability as primary obligors for, hereby unconditionally guaranty payment to Lender of, hereby agree to pay, protect, defend and save Lender harmless from and against, and hereby indemnify Lender from and against, any and all actual out-of-pocket liabilities, obligations, losses, damages (excluding (1) punitive or exemplary damages or diminution in value of

---

[1] An "Event of Default" is defined as, *inter alia*, Borrower's failure to make loan payments or to pay back the principal at maturity, failure to pay any other amount due under any of the Loan Documents, or failure to keep any other agreement contained or described in the Loan Documents; or Guarantor's default under any pledge or guaranty.  Leasehold Mortgage Note § 10.1; Building Mortgage Note § 10.1.

the Property or damages caused by the negligence or willful misconduct of Lender or those acting on behalf of Lender, and (2) consequential damages), out-of-pocket costs and expenses (including, without limitation, reasonable and documented attorneys' fees and costs), causes of action, suits, claims, demands and judgments, of any nature or description whatsoever, which may at any time be imposed upon, incurred by or awarded against Lender as a result of any of the following: . . .

    (iv) the (A) execution and delivery of any Lease which is not a Qualifying Lease (as such term is defined in the Building Loan Agreement) or (B) termination of any Lease as to which the tenant thereunder is not in default beyond any applicable grace, notice or cure period; or (C) amendment, modification, termination, or cancellation or surrender of the Ground Lease from Silk and Halpern, LLC to Borrower for the Property; . . .

    (c) The obligations of Guarantors set forth in <u>clauses (a)</u> and (<u>b</u>) of this <u>Section 1.2</u>, as and to the extent set forth in said <u>clauses (a)</u> and (<u>b</u>) of <u>this Section 1.2</u>, are hereinafter collectively referred to as the "**Guaranteed Obligations**". . . .

    Section 1.3   <u>Nature of Guaranty</u>.  This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by any Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) any Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced, pursuant to the Loan Documents, shall not release or discharge the obligation of Guarantors to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Notes and shall not be discharged by the assignment, sale, pledge, transfer, participation or negotiation of all or part of the Notes.

Guaranty §§ 1.1, 1.2, 1.3.

## D.  P8's Unpaid Rent

On October 24, 2023, P8 informed Cerco that it would not make the quarterly rent payment ("Ground Rent") on the Ground Lease due on November 1, 2023, and offered to tender the Property to Cerco.  FAC ¶ 41; *id.* Ex. 6 ("P8 Letter"), ECF No. 23-11.  P8 explained that, "due largely to macro-economic events affecting the real estate market generally, it no longer ha[d] any position of value in the Property."  P8 Letter at 2.  P8 did not pay the Ground Rent on November 1.  FAC ¶ 43.  On November 2, Silk & Halpern notified both P8 and Cerco that P8

was in default of the Ground Lease and had fifteen days to cure its default.  FAC ¶ 44; *id.* Ex. 8 ("Silk & Halpern Letter") at 3, ECF No. 23-13.  On November 3, Cerco informed Guarantors that P8 was in default on the Ground Lease.  FAC ¶ 45.  Citing Sections 1.2(a)(iv)(C) and 1.8 of the Guaranty, Cerco told Guarantors that, if Guarantors did not pay the rent by November 15, Cerco might "remit payment for the Ground Rent to Silk & Halpern . . . in order to preserve its rights in and to the collateral" and would "immediately demand payment from Guarantors for these out-of-pocket costs and expenses (including attorneys' fees), together with interest."  FAC Ex. 9 ("Cerco November 3 Letter") at 2-3, ECF No. 23-14.  P8 did not pay the Ground Rent by November 15.  FAC ¶ 46.

On November 20, "[i]n order to preserve its rights and to protect the security of the Mortgage," Cerco entered into an agreement with Silk & Halpern in which it agreed to make the November 1 rent payment.  FAC ¶ 47; *see id.* Ex. 7 ("November 20 Agreement"), ECF No. 23-12.  In exchange, Silk & Halpern agreed to "conditionally refrain from terminating" the Ground Lease.  November 20 Agreement at 1.  The agreement stated: "Upon timely clearance of the payments set forth above, the Default Notice shall be deemed withdrawn in its entirety and that [sic] the [Ground] Lease will continue in full force and effect without modification."  *Id.* at 2.  On or about November 29, Cerco paid $783,984 toward the Ground Rent payment.  FAC ¶ 48.

On November 29, December 5, and December 13, Cerco wrote to Guarantors informing them of P8's failure to cure and demanding indemnification for Cerco's payment toward the rent, plus interest and expenses.  *See* FAC Exs. 10, 11, & 12, ECF Nos. 23-16, 23-17, & 23-18.  Also on December 13, Cerco wrote to Guarantors stating that an event of default had occurred under the Loan Agreement and declaring the entire "unpaid principal amount of the Leasehold Note and Building Note, together with interests, costs, and fees, due and payable."  FAC Ex. 10, ECF No. 23-15.  It also stated that, "[t]o the extent that Cerco continues to pay the Ground Rent under

the Ground Lease, Cerco will continue to demand reimbursement from Borrower of its ongoing out-of-pocket payments each quarter." *Id.*

Cerco also paid the February 2024 quarterly rent payment, bringing its total payments, fees, costs, and expenses related to P8's unpaid rent to $1,696,069.92 as of March 1, 2024. FAC ¶¶ 59-60. P8 has not paid Cerco for the quarterly rent, fees, costs, and expenses, nor has it paid the outstanding balance on the Loan. FAC ¶ 61. Guarantors have also not paid Cerco the unpaid rent or the outstanding principal, interest, and costs on the Loan. FAC ¶ 73.

### E. Cerco's Claims

On December 21, 2023, Cerco filed a Complaint in this Court. *See* ECF No. 1. After Defendants filed a motion to dismiss, *see* ECF No. 20, Cerco filed a First Amended Complaint on March 5, 2024, *see* ECF No. 23. Cerco brings three causes of action against Guarantors.

*First*, Cerco alleges breach of contract based on Guarantors' failure "to honor the Guaranty." FAC ¶ 83. Cerco states that because "P8 defaulted on the Ground Lease and Loan Documents and failed to cure its default," Cerco "declared the entire unpaid principal sum plus all interest immediately due and payable pursuant to the Building Loan Agreement and Loan Documents." FAC ¶¶ 77-78. Cerco asserts that "[t]he Guaranty is triggered" by (1) P8's default, (2) the November 20 agreement between Cerco and Silk & Halpern, and (3) Cerco's payment of the Ground Rent, each of which constitutes an "amendment, modification, termination, or cancellation or surrender of the Ground Lease" under § 1.2(a)(iv)(C) of the Guaranty. FAC ¶¶ 79-81. Cerco further alleges that "Guarantors have not indemnified Cerco for its 'out-of-pocket liabilities, obligations, losses, damages . . . out-of-pocket costs and expenses . . . .' and the 'amount due'" under §§ 1.2(a), 1.5 of the Guaranty. FAC ¶ 82. As a result, Cerco seeks damages of "$13,864,229 on the unpaid principal, interest, and other costs and charges" under the Loan, and "$1,696,069 on the quarterly Ground Rent payments, fees, and costs, plus default

interest at 24%, any future Ground Rent payments, and its out-of-pocket costs, attorneys' fees, and expenses." FAC ¶ 84.

*Second*, Cerco brings a claim for breach of the implied covenant of good faith and fair dealing. Cerco states that "Guarantors represented and warranted that '[e]very Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of [P8] and is familiar with the value of any and all collateral,'" FAC ¶ 88, and that "Guarantors have superior knowledge with respect to P8's financial status" and "P8's management of the Property." FAC ¶¶ 89-90. Cerco alleges that "Guarantors, in bad faith, withheld material information from Cerco with respect to P8's financial condition and management of the Property" and "deceived Cerco by preventing Cerco to receive its benefit of what it bargained for under the Guaranty." FAC ¶ 91. On this claim, Cerco also seeks $13,864,229 on the outstanding Loan and $1,696,069 on the unpaid Ground Rent, plus interest, costs, and fees. FAC ¶ 92.

*Third*, Cerco seeks a declaratory judgment under the Federal Declaratory Judgments Act, 28 U.S.C. § 2201(a), declaring that P8 defaulted on the Ground Lease and failed to cure its default, resulting in a default under the Loan Documents; that Cerco may therefore declare the entire unpaid principal and interest on the Loan due and payable; that the Guaranty is triggered by "amendment, modification, termination, cancellation, or surrender of the Ground Lease" in the form of P8's default, the November 20 Agreement, and/or Cerco's payments of the Ground Rent; and that Guarantors are required to pay "any and all actual out-of-pocket liabilities, obligations, losses, damages, out-of-pocket costs and expenses, including attorneys' fees" under § 1.2 of the Guaranty and the "amount due," including unpaid principal, interest, costs, and fees on the Loan, under § 1.5 of the Guaranty. FAC ¶ 97.

Defendants moved to dismiss the FAC under Rules 12(b)(1) and 12(b)(6).  *See* Defs.'
Mem. Supp. Mot. to Dismiss ("Defs.' Mem."), ECF No. 40.  They argue that (1) Plaintiff failed
to establish the diversity of citizenship required for this Court's subject matter jurisdiction; (2)
Plaintiff failed to plead a claim for breach of contract because its own pleading demonstrates that
the Ground Lease was not amended, modified, terminated, cancelled, or surrendered; (3) Plaintiff
failed to plead its implied-covenant claim with particularly as required by Rule 9(b); and (4)
Plaintiff's declaratory-judgment claim serves no useful purpose.  *See* Defs.' Mem. 9-13, 14-22,
22-25, 25.

## LEGAL STANDARDS

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)
when the district court lacks the statutory or constitutional power to adjudicate it."[2]  *Makarova v.
United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In resolving such a motion, "the court must
take all facts alleged in the complaint as true and draw all reasonable inferences in favor of
plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing
from the pleadings inferences favorable to the party asserting it."  *Morrison v. Nat'l Australia
Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).  Where "jurisdictional
facts are placed in dispute," "the party asserting subject matter jurisdiction has the burden of
proving by a preponderance of the evidence that it exists."  *Tandon v. Captain's Cove Marina of
Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  "Although courts are generally limited to
examining the sufficiency of the pleadings on a motion to dismiss, on a challenge to the district
court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by

---

[2] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations
from cases, the Court omits citations, alterations, emphases, internal quotation marks, and
ellipses, unless otherwise indicated.

reference to evidence outside the pleadings." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 255 n.1 (2d Cir. 2003).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing the complaint, the court "must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. But the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In applying Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021). "Furthermore, where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011).

## DISCUSSION

### A. Motion to Dismiss Under Rule 12(b)(1)

Plaintiff invokes this Court's diversity-of-citizenship jurisdiction under 28 U.S.C. § 1332 "because Cerco and Schenker and Hornstock are citizens of different states and the matter in controversy exceeds the sum or value of $75,000." FAC ¶ 24. Defendants argue that Plaintiff's "constantly shifting jurisdictional contentions simply do not add up, and publicly available information directly undermines them." Defs.' Mem. 9. After reviewing the pleadings and declarations, the Court concludes that Plaintiff has satisfactorily shown diversity of citizenship.

"[F]or purposes of diversity jurisdiction, a limited liability company has the citizenship of its membership." *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000) (citing *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998)). A corporation is deemed a citizen of every state or country in which it is incorporated and of the state or country where it has its principal place of business. 28 U.S.C. § 1332(c)(1). "A corporation's principal place of business under § 1332 is 'the place where a corporation's officers direct, control, and coordinate the corporation's activities.'" *OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 218 (2d Cir. 2016) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010)).

Here, the parties do not dispute that Defendants are citizens of New York; at issue is the citizenship of Cerco, a limited liability company. *See* Defs.' Mem. 9-13; Pl.'s Mem. Opp. Mot. to Dismiss & Supp. Cross-Mot. Summ. J. ("Pl.'s Mem.") 9-13, ECF No. 46. Plaintiff alleges that "Cerco has one member, Cerco Capital Inc.," which is "a Delaware corporation" with "a principal place of business" in "New Providence, Bahamas." FAC ¶ 17. If Plaintiff's allegations are true, then both Cerco Capital and Cerco (the LLC) are citizens of Delaware and the Bahamas, and complete diversity exists between Plaintiff and Defendants.

Defendants contest Plaintiff's allegations, arguing that publicly available evidence suggests Cerco may well be a citizen of New York. *See* Defs.' Mem. 9-13. First, Defendants argue that Plaintiff's allegation of "*a* principal place of business" in the Bahamas, *see* FAC ¶ 17 (emphasis added), is "improperly equivocal and evasive." *Id.* at 10. Defendants cite Third Circuit authority suggesting that the FAC's reference to "a" principal place of business, were it the only piece of information before the Court, might be insufficient to support diversity jurisdiction. *See J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1265 n.3 (3d Cir. 1994) (noting that complaint alleged "a" principal place of business in New Jersey, leaving open the possibility that corporation had "its" principal place of business in Florida). But

here, as in *J & R Ice Cream Corp.*, Plaintiff has offered "supporting material" indicating that its *sole* principal place of business is in the Bahamas. *Id.*; *see, e.g.*, Corrected Cervinka Decl. at ¶ 4, ECF No. 28 ("*The* principal place of business for Cerco Capital Inc is . . . The Bahamas." (emphasis added)). Accordingly, under the Third Circuit's precedent, any "jurisdictional problem" arising from the FAC's use of the indefinite article would nevertheless be "cured" by that supporting evidence. *J & R Ice Cream Corp.*, 31 F.3d at 1265 n.3.

Defendants next point to record evidence and publicly available documents suggesting that Cerco Capital's principal place of business is not in the Bahamas, as Cerco says, but in New York. Specifically, Defendants argue that:

- Cerco Capital's claimed principal place of business in the Bahamas is an apartment in a gated residential community (Defs.' Mem. 11);

- Cerco's Chief Executive Officer, Peter Cervinka, claims he directs Cerco Capital's activities from his residence in the Bahamas, but he does not purport to be an officer of Cerco Capital (*id.* at 12);

- The only identified officer of Cerco Capital, Wayne Sturman, has a public LinkedIn page citing his location as "New York, New York" (*id.*);

- Mr. Sturman executed the Loan Documents in New York (*id.*);

- Mr. Sturman, Mr. Cervinka, and a third colleague, Michael Bodnev, all hold themselves out publicly as New York-based executives working from the New York offices of Cerco Funding LLC at 230 Central Park South (*id.*);

- Mr. Cervinka has New York State broker's licenses listing the Central Park South address as his principal office and practice location (*id.* at 13); and

- Mr. Cervinka listed a phone number with a (212) area code in correspondence in November 2023, shortly before this action was filed (*id.*).

Against those arguments, Cerco presents a declaration by Mr. Cervinka stating that:

- Mr. Cervinka is "domiciled in, and a permanent resident of, the Commonwealth of The Bahamas," and he "direct[s], control[s], and coordinate[s] Cerco Bridge and Cerco Capital Inc's business activities from [his] residence in The Bahamas" (Corrected Mr. Cervinka Decl. ¶¶ 5-6);

12

- "The principal place of business for Cerco Capital Inc is Venetian West, Unit 1602, Windsor Field Road, New Providence, The Bahamas" (*id.* ¶ 4);

- "All of Cerco Bridge and Cerco Capital Inc's employees work remotely from their own personal residence" (*id.* ¶ 7);

- Mr. Sturman, the President of Cerco Capital Inc., "is domiciled in the State of Connecticut" and "assists . . . with directing, controlling, and coordinating Cerco Bridge and Cerco Capital Inc's business activities from his residence in Connecticut" (*id.* ¶ 8);

- Mr. Bodnev "is domiciled in the State of New Jersey," and "does not assist . . . with directing, controlling, or coordinating Cerco Bridge or Cerco Capital Inc." (*id.* ¶ 9);

- "As of the commencement of this litigation, neither Cerco Bridge nor Cerco Capital Inc has an office, building, or residence in the State of New York" (*id.* ¶ 11); and

- "As of the commencement of this litigation, no executive who assists . . . with directing, controlling, and/or coordinating either Cerco Bridge or Cerco Capital Inc is a resident of, domiciled in, or has a business address in, the State of New York" (*id.* ¶ 12).

Mr. Cervinka's affirmations are reiterated in relevant part by Sturman in a declaration submitted in response to Defendants' Motion to Dismiss.  *See* Sturman Decl. ¶¶ 3-5, ECF No. 48 (confirming, *inter alia*, that Cerco Capital has no office, that all its employees work from home, that Mr. Cervinka directs the business from the Bahamas, and that Sturman assists in directing the business from Connecticut).

Although Defendants' evidence certainly suggests that Cerco Capital's directors are affiliated with New York and may have been based in New York in the past, at this stage of proceedings the Court sees no reason not to credit Plaintiff's declarations affirming that, as of the commencement of this litigation, Cerco Capital did not have a principal place of business in New York.  After all, "in the post-COVID-19 era, . . . substantially more employees telecommute," *Derrica v. Tura, Inc.*, No. 21 Civ. 8820, 2022 WL 1421452, at *3 (S.D.N.Y. May 5, 2022), and many businesses have moved away from physical headquarters—as P8's decision to stop paying rent on office building in Manhattan may well illustrate.  *See generally* Katelyn L. Simmons, *Tackling Principal Place of Business Post-Pandemic: When Headquarters Are Empty*

13

*Boardrooms*, 18 Charleston L. Rev. 335 (2023).  Moreover, it is not implausible that executives active in the New York commercial real estate market might conduct the bulk of their work from homes in Connecticut or the Bahamas.[3]  The Court therefore finds that, for purposes of surviving a motion to dismiss, Plaintiff has adequately established diversity of citizenship.  *See Charles v. Slade Indus., Inc.*, No. 19 Civ. 3013, 2019 WL 6768659, at *2 (E.D.N.Y. Dec. 12, 2019) (finding that various online sources suggesting corporation had headquarters in New York did not establish New York as its principal place of business, because corporation's president submitted a declaration stating that all decision-making and activities were conducted out of headquarters in New Jersey).  Because there is no question that the amount in controversy exceeds $75,000, the Court concludes that it has subject matter jurisdiction and proceeds to the merits.

**B.  Motion to Dismiss Under Rule 12(b)(6)**

Defendants argue that Plaintiff fails to state a viable claim for breach of contract, breach of the implied covenant of good faith and fair dealing, or a declaratory judgment.  The Court addresses each in turn.

**1.  Breach of Contract**

To establish a breach of contract under New York law, which governs the interpretation of the Guaranty,[4] a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages."  *CP III Rincon Towers, LLC v. Cohen*, No. 10 Civ. 4638, 2022 WL 61318, at *7

---

[3] The Court need not decide whether Mr. Cervinka's residence or Sturman's is most relevant to determining Cerco Capital's principal place of business, since both affirm that neither is a resident or domiciliary of New York.  Corrected Mr. Cervinka Decl. ¶¶ 5, 8; Sturman Decl. ¶¶ 4-5.

[4] The Guaranty states that "this agreement shall be governed by and construed in accordance with the laws of the State of New York," Guaranty § 6.3(a), and neither party disputes that New York law applies.

(S.D.N.Y. Jan. 6, 2022).  "A written contract must be interpreted according to the parties' intent, which is derived from the plain meaning of the language employed in the agreements."  *Id.*  In a dispute over the meaning of a contract, a threshold question of law is "whether the contract terms are ambiguous."  *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).  In general, "ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 75 (2d Cir. 2009).  "If the court determines the operative contract to be ambiguous, it may evaluate the extrinsic evidence as a matter of law."  *Bank of N.Y. Tr. Co., N.A. v. Franklin Advisers, Inc.*, 726 F.3d 269, 275 (2d Cir. 2013).

Under New York law, the "obligations of a guarantor should be strictly construed," *Dunkirk Tr. Co. v. Schmitt*, 316 F.2d 537, 539 (2d Cir. 1963) (citing *Wesselman v. Engel Co.*, 127 N.E.2d 736 (N.Y. 1955)), and "cannot be extended by construction beyond the plain and explicit language of the contract," *Key Bank of Long Is. v. Burns*, 162 A.D.2d 501, 503 (2d Dep't 1990).  "Guarantees are strictly construed because the guarantor cannot be held responsible to guarantee a performance different from that which he intended or specified in the guaranty."  *Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 93 F.3d 1064, 1073-74 (2d Cir. 1996).

The parties advance markedly different interpretations of the Guaranty, in three critical respects.  First, Plaintiff contends that it is an absolute "guaranty of payment" binding the guarantors to pay the entire debt obligation if the borrower fails to do so, while Defendants assert that it is a "carve-out" guaranty triggered only by the occurrence of certain defined events within the control of the guarantors.  *See* FAC ¶ 6; Pl.'s Mem. 2; Defs.' Mem. 15.  Second, Plaintiff

argues that, even if the Guaranty is a carve-out guaranty, Defendants are liable for the entire debt if one of the triggering events has occurred (*i.e.*, full recourse liability).  *See* Pl.'s Mem. 24-25. Defendants, by contrast, maintain that they could be liable only for losses arising from the triggering event, not the entire loan (*i.e.*, loss recourse liability).  *See* Defs.' Mem. 16.  Finally, Plaintiff argues that P8's default on the Ground Rent triggered the carve-out provision because it was an "amendment, modification, termination, or cancellation or surrender of the Ground Lease."  Pl.'s Mem. 2 (quoting Guaranty § 1.2(a)(iv)); *see id.* at 18-23.  Defendants counter that, under the explicit terms of the Ground Lease, no amendment, modification, termination, cancellation, or surrender of the Ground Lease has occurred.  Defs.' Mem. 15-16.

In sum, the parties disagree on three key questions: (1) what triggers the Guaranty (*i.e.*, whether it is a full payment guaranty or a carve-out guaranty), (2) what liability the Guaranty imposes if triggered (*i.e.*, whether it is full recourse or loss recourse), and (3) whether the carve-out conditions have been triggered (*i.e.*, whether there has been an amendment, modification, termination, cancellation, or surrender of the Ground Lease).  The Court will address the first two questions followed by the third.

a.  *The Nature of the Guaranty*

"Lenders have long sought to enhance their recoveries on bad loans by requiring guaranties from a borrower's owner, affiliate or other related party."  Lauren Beslow & Travis Eliason, *Commercial Loan Guaranties and Enforcement of Non-Recourse Carve-Out Liability*, 27 Com. Lending Litig. News 2 (2015).  While "the typical non-recourse loan limits a lender's recovery from the borrower to the value of the collateral," guaranties ensure additional recovery from the guarantor.  *Id.*  Guaranties come in several forms.  One is a "principal payment guaranty," in which "a guarantor agrees to pay all or part of the borrower's obligation in the event that the borrower does not pay."  *Id.*  Another is a "carve-out guaranty, known colloquially

in the industry as a 'bad boy guaranty,'" which "requires defendants to compensate the lenders in the event they or the [b]orrower engage in certain acts that could harm the lenders' interest in the collateral or the lenders' ability to enforce their rights under the loan agreement." *Nexbank, SSB v. Soffer*, 41 N.Y.S.3d 217, 218 (N.Y. App. Div. 2016). "Bad boy guarantees are frequently required by lenders providing financing to special purpose entities, often in real estate transactions, to permit the lender to pursue the individual controlling the special purpose borrower for actions that undermine the value of the lender's collateral." *CP III Rincon Towers, Inc. v. Cohen*, 666 F. App'x 46, 49 n.1 (2d Cir. 2016).

"Bad boy" or carve-out guaranties may be full recourse, subjecting the guarantor to liability for the entire debt if the triggering event occurs, or they may impose lesser liabilities. *See D.B. Zwirn Special Opportunities Fund, L.P. v. SCC Acquisitions, Inc.*, 902 N.Y.S.2d 93, 94 (N.Y. App. Div. 2010) (describing a "carve-out guaranty" in which "defendant becomes liable for *all or part* of its affiliates' payment obligations upon the occurrence of certain events" (emphasis added)). For example, a carve-out guaranty may be non-recourse or "loss recourse"— requiring the guarantor to cover losses sustained by the lender as a result of the borrower's failure to comply with its obligations under the carve-out, but not "the entire amount of the loan." *CP III Rincon Towers, Inc.*, 666 F. App'x at 49.

By its plain terms, the Guaranty is unambiguously a carve-out guaranty. It lists a number of specific "Guaranteed Obligations" and provides for liability if those obligations are breached, but it does not assign any liability to Guarantors beyond that enumerated list. Specifically, Section 1.1 of the Guaranty, titled "Guaranty of Obligations," states that "Guarantors hereby irrevocably and unconditionally guaranty to Lender and its successors and assigns *the payment and performance of the Guaranteed Obligations*." Guaranty § 1.1 (emphasis added). Section 1.2, titled "Definition of Guaranteed Obligations," provides:

> (a)     Guarantors hereby assume liability as primary obligors for, hereby unconditionally guaranty payment to Lender of, hereby agree to pay, protect, defend and save Lender harmless from and against, and hereby indemnify Lender from and against, any and all actual out-of-pocket liabilities, obligations, losses, damages . . . , out-of-pocket costs and expenses . . . , causes of action, suits, claims, demands and judgments, of any nature or description whatsoever, which may at any time be imposed upon, incurred by or awarded against Lender as a result of any of the following:

Guaranty § 1.2(a).  Subsection 1.2(a) then lists out a number of scenarios: (i) violation of environmental laws by Borrower or Guarantor; (ii) material physical waste due to negligence or willful misconduct, or the removal or disposal of any portion of the property, by Borrower or Guarantor; (iii) misapplication or misappropriation of various monies by Borrower; (iv) various lease impairments, including "amendment, modification, termination, or cancellation or surrender of the Ground Lease"; (vi) criminal activity relating to the Property by Borrower or Guarantor; or (vii) Borrower incurring new indebtedness without Lender's consent.  Guaranty §§ 1.2(a)(i)-(vii).  Subsection (b) provides another list of scenarios, including Borrower filing a voluntary petition for bankruptcy or making an assignment for the benefit of creditors, and states that "Guarantors hereby acknowledge and agree that the Guaranteed Obligations shall be fully recourse to each Guarantor in the event" of one of those scenarios.  Guaranty §§ 1.2(b), (b)(i), (b)(v).  Subsection (c) then states: "The obligations of Guarantors set forth in clauses (a) and (b) of this Section 1.2, as and to the extent set forth in said clauses (a) and (b) of this Section 1.2, are hereinafter collectively referred to as the 'Guaranteed Obligations.'"  Guaranty § 1.2(c).

Nowhere does the Guaranty assign any liability to Guarantors except upon failure to perform the Guaranteed Obligations.  The Guaranteed Obligations, in turn, describe the "bad boy" events that would trigger liability under the carve-out.  *See* Guaranty §§ 1.2(a)(i)-(vii) and (b)(i)-(vi).  They all describe acts within the control of Borrower or Guarantors that would

threaten the value of Cerco's collateral (that is, the leasehold). The Court therefore rejects the contention that the Guaranty is an unconditional guaranty of payment.

Plaintiff protests, quoting language from the "Nature of Guaranty" section stating that the Guaranty "is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection." Pl.'s Mem. 15 (quoting Guaranty § 1.3). But that merely distinguishes between *payment* and *collection*—clarifying that this guaranty, once invoked, permits the lender to obtain immediate payment from the guarantors rather than requiring it to first pursue a judgment against the borrower. *See N.Y.C. Dep't. of Fin. v. Twin Rivers, Inc.*, 920 F. Supp. 50, 52 (S.D.N.Y. 1996) (explaining that "[i]n a guaranty of collection, the guarantor undertakes the responsibility to pay if and only if the debt cannot be collected from the principal through legal proceedings," while "a creditor who seeks to enforce a guaranty of payment need not take any preliminary steps against the principal debtor before he seeks to collect the debt"). The very next sentence makes clear that the Guaranty is tethered to the Guaranteed Obligations: "This Guaranty may not be revoked by any Guarantor and shall continue to be effective *with respect to any Guaranteed Obligations* arising or created after any attempted revocation . . . ." Guaranty § 1.3 (emphasis added). In any event, even if the Guaranty's use of the phrase "guaranty of payment" could be read to suggest that it is *not* a carve-out guaranty, the more specifically enumerated Guaranteed Obligations negate that suggestion. *See Green Harbour Homeowners' Ass'n v. G.H. Dev. & Constr., Inc.*, 789 N.Y.S.2d 319 (N.Y. App. Div. 2005) ("Where a contract . . . employs contradictory language, specific provisions control over general provisions." (citing *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956))).

Plaintiff next argues that the Guaranty "contains both an absolute guaranty of payment **and** a guaranty of performance with respect to additional, specifically defined obligations." Pl.'s Mem. 16. Thus, according to Plaintiff, "Guarantors are liable for both defaults on the underlying

debt and the specifically enumerated 'Guaranteed Obligations.'" *Id.* at 18. But nothing in the Guaranty suggests that any part of it operates independently of the enumerated Guaranteed Obligations—indeed, nearly every section of Article I ("Nature and Scope of Guaranty") references the Guaranteed Obligations. *See* Guaranty §§ 1.1-1.10. Moreover, if the Guaranty contemplated a guaranty of payment upon any default by Borrower on the underlying debt, then there would be no reason to separately enumerate a list of conditions that trigger full recourse liability in the event of Borrower's bankruptcy—in which event Borrower would almost certainly have also defaulted on the debt. *See* Guaranty § 1.2(b)(i)-(b)(iii). In other words, Plaintiff's interpretation of the Guaranty would render much of Section 1.2(b) superfluous. *See Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("[Courts] disfavor contract interpretations that render provisions of a contract superfluous."); *Columbus Park Corp. v. Dep't of Hous. Pres. & Dev. of City of N.Y.*, 598 N.E.2d 702 (N.Y. 1992) ("[A] construction which makes a contract provision meaningless is contrary to basic principles of contract interpretation.").

Finally, Plaintiff argues that even under a carve-out guaranty, Defendants are liable for the entire debt if the Guaranteed Obligations are breached. Pl.'s Mem. 29-30. That is, Plaintiff maintains that the Guaranty is, at minimum, a full-recourse carve-out guaranty. Plaintiff is mistaken, at least as to the Guaranteed Obligations listed in Section 1.2(a). Guarantors are liable for "actual out-of-pocket liabilities, obligations, losses, damages . . . , out-of-pocket costs and expenses . . . , causes of action, suits, claims, demands and judgments . . . incurred by or awarded against Lender *as a result of any of*" the Guaranteed Obligations in Section 1.2(a). Guaranty § 1.2(a) (emphasis added). Although Plaintiff elides the phrase "as a result of" at various points, *see* FAC ¶¶ 4, 6, 13, 82, that phrase is key to understanding that the Guaranty is not fully recourse (it is merely loss recourse) as to the Guaranteed Obligations in Section 1.2(a). If, as

20

Plaintiff argues, the nonpayment of Ground Rent violates Section 1.2(a)(iv) of the Guaranteed Obligations, then Guarantors must cover all out-of-pocket losses *caused by* the nonpayment of rent, plus costs, expenses, and fees—not the entire debt.

Section 1.2(b) reinforces that conclusion. The Guaranteed Obligations in that subsection, which concern intentional bankruptcy and other forms of business liquidation, are "fully recourse to each Guarantor." Guaranty § 1.2(b). But Section 1.2(a), critically, does not employ that phrase. Because it would be unnecessary to separate out subsections (a) and (b) if there were no difference in the liabilities arising from each, Plaintiff's interpretation is clearly at odds with the parties' intent. *See Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 557 (N.Y. App. Div. 1996) ("When interpreting a written contract, the court should give effect to the intent of the parties as revealed by the language and structure of the contract.").

     *b. Whether the Guaranteed Obligations Have Been Breached*

Plaintiff contends that P8's failure to pay the quarterly Ground Rent resulted in an "amendment, modification, termination, or cancellation or surrender of the Ground Lease," Guaranty § 1.2(a)(iv), thus triggering Defendants' liability under the Guaranteed Obligations. *See* FAC ¶ 9. The Court disagrees.

As an initial matter, as Defendants point out, when Cerco and Silk & Halpern agreed that Cerco would pay the rent on P8's behalf, their agreement stated that "[u]pon timely clearance of the payments [by Cerco], the Default Notice shall be deemed withdrawn in its entirety and that the Net Lease *will continue in full force and effect without modification*." November 20 Agreement 2 (emphasis added). That is strong evidence that the Ground Lease was not amended, modified, terminated, or surrendered, and Defendants argue that it is enough for Plaintiff to have "plead[ed] [it]self out of court by alleging facts that show [it] has no claim." *Soto v. Disney Severance Pay Plan*, 26 F.4th 114, 120 (2d Cir. 2022); *see* Defs.' Mem. 21.

The Court need not decide whether the November 20 Agreement is dispositive on its own, however, because the terms of the Ground Lease conclusively refute Plaintiff's argument. The Ground Lease anticipates the precise scenario here: that the tenant (P8) might default on the rent and the leasehold mortgagee (Cerco), to preserve its collateral, might wish to pay it. *See* Ground Lease Part I § 15(a)(ii). Under the terms of the Ground Lease, the leasehold mortgagee is entitled to notice and the right to cure the tenant's default before the lease can be terminated. *Id.* Specifically:

> (ii)    Landlord shall give written notice [of Tenant's default] to any Leasehold Mortgagee . . . and Landlord shall take no action to terminate this Lease . . . , provided that:
>
> (A)    if such default is a default in the payment of any installment of basic net rent or any additional rent, such Leasehold Mortgagee cures such default on or before the date that is the later of (i) fifteen (15) days after the date that such default is required to be cured by Tenant hereunder; and (ii) fifteen (15) days after such Leasehold Mortgagee's receipt of such notice . . . .

Ground Lease Part I § 15(a)(ii), (a)(ii)(A). Here, P8 failed to pay rent on November 1, 2023. FAC ¶ 43. On November 2, Silk & Halpern notified P8 and Cerco that P8 was in default and had fifteen days to cure its default. FAC ¶ 44; Silk & Halpern Letter 3. On November 20, Cerco agreed with Silk & Halpern that it would cover P8's rent payment, and on or about November 29 it paid the rent. FAC ¶¶ 47-48. Cerco therefore cured P8's default within fifteen days of P8's own deadline to cure, as required. Accordingly, under the terms of the Ground Lease—and consistent with the November 20 Agreement between Cerco and Silk & Halpern that the lease would "continue in full force and effect without modification," November 20 Agreement at 2— the lease was not terminated.

Nor was the lease amended, modified, or surrendered. The Ground Lease provides that:

> Landlord and Tenant will not surrender, accept a surrender of, abandon, reject, materially modify or amend this Lease . . . , subject to the cure rights granted in this Lease to a Leasehold Mortgagee, and Tenant shall not voluntarily waive any of its

rights hereunder by its affirmative act, in any respect and in any such case *without the prior written consent of the Leasehold Mortgagee* and no Leasehold Mortgagee shall be bound by any such surrender, acceptance of surrender, abandonment, rejection, material modification, amendment or subordination of this Lease to any fee mortgage as to which the Leasehold Mortgagee has not consented.

Ground Lease Part I § 15(a)(i) (emphasis added). Plaintiff has not alleged that it consented, in writing, to the amendment, modification, or surrender of the Ground Lease.[5] Plaintiff's arguments that the Ground Lease was amended or modified because Plaintiff "stepped into the shoes of P8" by paying the rent, Pl.'s Mem. 19, or that P8's default was a surrender by operation of law, *id.* at 22, are therefore foreclosed by the express terms of the Ground Lease.

Because Plaintiff has not pleaded facts showing that the Ground Lease was amended, modified, terminated, or surrendered, it has failed to plead a violation of the Guaranteed Obligations. Plaintiff therefore fails to state a claim for breach of the Guaranty, and that claim is hereby dismissed.

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). That covenant embraces "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* If a claim for breach of the implied covenant of good faith and fair dealing sounds in fraud, it must be pleaded with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *See Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 387-88 (S.D.N.Y. 2016). That is, the "breach of the implied

---

[5] Plaintiff argues that its agreement to pay the rent demonstrates its consent to P8's surrender of the lease, but it does not indicate that it ever consented in writing. *See* Pl.'s Mem. 23. Instead, the written agreement in which Cerco committed to paying the rent stated that the lease would "continue in full force and effect without modification." November 20 Agreement 2.

covenant of good faith and fair dealing claims must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id.* at 388 (quoting *Lerner v. Fleet Bank*, 459 F.3d 273, 290 (2d Cir. 2006)).

Plaintiff alleges that Defendants "in bad faith[] withheld material information from Cerco with respect to P8's financial condition and management of the Property," and that "Guarantors deceived Cerco by preventing Cerco to receive [sic] its benefit of what it bargained for under the Guaranty." FAC ¶ 91. As Defendants point out, an allegation of omission with intent to deceive "is a quintessential averment of fraud," Defs.' Mem. 22 (quoting *Matsumura v. Benihana Nat. Corp.,* 542 F. Supp. 2d 245, 252 (S.D.N.Y. 2008)). Plaintiff does not contest that point. The Court therefore concludes that Plaintiff's implied covenant claim sounds in fraud and must be pleaded with particularity. *See Fernandez*, 222 F. Supp. 3d at 388.

Plaintiff's implied covenant allegations fall far short of Rule 9(b)'s heightened pleading standard. The only statement Plaintiff points to is Guarantors' representation in the Guaranty that they were "familiar with, and ha[d] independently reviewed books and records regarding, the financial condition of [P8] and [were] familiar with the value of any and all collateral intended to be created as security for the payment." FAC ¶ 88 (quoting Guaranty § 3.2). But Plaintiff does not explain how Guarantors' statement that they had reviewed P8's financials was allegedly fraudulent. Plaintiff alleges that Guarantors had "superior knowledge" of P8's financial situation and withheld information in bad faith, but it never explains what information Guarantors supposedly had that they concealed from Plaintiff. FAC ¶¶ 89-91. Those threadbare allegations fail entirely to "specify the statements that the plaintiff contends were fraudulent" or "explain why the statements were fraudulent." *Fernandez*, 222 F. Supp. 3d at 388. Accordingly, Plaintiff's claim for breach of the implied covenant is dismissed.

### 3. Declaratory Judgment

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Courts have consistently interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). In deciding whether to exercise their discretion to render declaratory judgments, courts in the Second Circuit have typically considered "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Id.*

A declaratory judgment in this case would serve no useful purpose and offer no relief from uncertainty. The Court has already decided the questions on which Plaintiff seeks declaratory relief, *see* Pl.'s Mem 33-34, in its analysis of the breach of contract claim. *See supra* Part I.B.1. Accordingly, the Court dismisses Plaintiff's claim for a declaratory judgment.

### C. Cross-Motion for Partial Summary Judgment

Because the Court dismisses the First Amended Complaint in its entirety, it **DENIES** Plaintiff's Cross-Motion for Partial Summary Judgment.

### D. Motions for Discovery Sanctions

Defendants seek sanctions against Plaintiff and its counsel[6] in connection with CEO Peter Cervinka's failure to appear at two depositions on May 7, 2024 and July 10, 2024. *See* ECF Nos. 78 & 113. For the reasons that follow, the Motions for Sanctions are **GRANTED IN PART**.

### 1. Factual Background

The parties do not appear to dispute the relevant facts. On April 11, 2024, Defendants noticed Mr. Cervinka's deposition for May 3, 2024. Herrmann Decl. Supp. First Mot. Sanctions ("First Herrmann Decl.") ¶ 2, ECF No. 80; *see id.* Ex. 1. On April 18, Plaintiff's counsel stated that they were unavailable on that date and would confer in good faith on other dates. *Id.* Ex. 2. On April 19, Defendants sent Plaintiff a letter in which they agreed to reschedule the deposition but advised that they needed it to take place at least a week before the May 17 deadline for filing their opposition to Plaintiff's Cross-Motion for Summary Judgment. *Id.* Ex. 3 at 3. Defendants proposed May 6, 7, or 8 and asked Plaintiff's counsel to confirm availability. *Id.* On April 25, having heard nothing from Plaintiff's counsel, Defendants served an amended notice of deposition for May 7. *Id.* ¶ 5; *see id.* Ex. 4.

On a phone call on April 30, Plaintiff's counsel raised for the first time an objection to Mr. Cervinka's deposition, arguing that the Court's earlier denial of Defendants' request for expedited jurisdictional discovery amounted to an indefinite stay of jurisdictional discovery. *Id.* ¶ 6. The following day, by email, Defendants disagreed that jurisdictional discovery was stayed but insisted that, in any event, Mr. Cervinka's deposition should go forward because it covered both jurisdictional and merits issues. *Id.* ¶ 7; *id.* Ex. 5 at 6-7. Two days later, on May 3, Plaintiff

---

[6] Plaintiff's counsel until very recently was the law firm Fox Rothschild LLP ("Fox Rothschild"). On December 27, 2024, the Court granted Fox Rothschild's motion to withdraw as counsel for Cerco and stayed the case pending resolution of the instant motions. *See* Order, ECF No. 187.

responded that it planned to file a motion seeking clarification of the Court's earlier order; counsel for Defendants urged Plaintiff's counsel instead to place a joint call to chambers given that the deposition was noticed to proceed in two business days. *Id.* Ex. 5 at 5. Plaintiff's counsel said they were unavailable that day to call chambers. *Id.* at 4. That afternoon, Defendants' counsel wrote that his partner was getting on a plane from Los Angeles and that Defendants were "proceeding with the intent that the deposition will go forward as planned." *Id.* at 3. Plaintiff's counsel responded, "We are not available on May 7," and "we trust you would agree that the deposition is adjourned pending a decision from" the Court. *Id.* at 2. Defendants' counsel stated that the deposition should not be postponed based on the mere filing of the motion to quash, which had not yet been decided at that point. *Id.* at 1.

Plaintiff's letter-motion, filed on Friday, May 3, sought to quash the May 7 deposition on the grounds that (a) the Court's order denying expedited jurisdictional discovery was a stay of all jurisdictional discovery, and (b) the merits issues Defendants wished to explore amounted to improper extrinsic evidence. *See* ECF No. 51. Plaintiff urged that "Mr. Cervinka's deposition should be adjourned until after the completion of paper discovery and the Court's decision on the pending motions." *Id.* On Monday, May 6, the Court "denie[d] Plaintiff's request to quash Mr. Cervinka's deposition." Order Denying Mot. to Quash 2, ECF No. 53. The Court explained that its earlier order "did not stay jurisdictional discovery" and that Plaintiff was free to raise any argument about extrinsic evidence in its opposition papers. *Id.*

Upon receiving the Court's order at 5:40 p.m. on Monday, May 6, counsel for Defendants wrote to Plaintiff's counsel that, "[f]urther to the Court's order of this afternoon, we will plan to get started with Mr. Cervinka's deposition at 10:00 a.m. tomorrow." First Herrmann Decl. Ex. 6 at 2-3. Counsel for Plaintiff responded: "I will not be producing the witness tomorrow. I will be producing the witness anytime you want next week. I can probably produce a witness later this

week.  I cannot do it tomorrow." *Id.*  Defendants' counsel protested that his partner had just

flown to New York to take the deposition the following day and would be returning to Los

Angeles that same day after the deposition.  *Id.* at 1.  Plaintiff's counsel reiterated: "I cannot

produce the witness tomorrow.  I will not do so.  I may be able to produce them on Thursday or

Friday of this week and as I've said, I can produce some next week." *Id.*  Defendants ultimately

were unable to take Mr. Cervinka's deposition in New York on May 7, but they subsequently

took a half-day, virtual deposition on May 10.  *See id.* Ex. 7.

On May 22, Defendants emailed Plaintiff to schedule the remainder of Mr. Cervinka's

deposition.  *Id.* Ex. 8 at 1-2.  Nearly a month later, on June 21, Plaintiff offered the date of July

10.  *Id.* Ex. 11 at 1.  On June 26, during the parties' meet-and-confer conversations, Plaintiff

informed Defendants that Mr. Cervinka would only be available virtually because he was living

in Europe.  Barbet Decl. Opp. Second Mot. Sanctions ("Barbet Decl.") ¶ 2, ECF No. 120;

Herrmann Decl. Supp. Second Mot. Sanctions ("Second Herrmann Decl.") ¶ 5, ECF No. 115.

Although Defendants considered the possibility of a remote deposition, Barbet Decl. ¶ 3, they

wrote back on June 28 stating that they would not agree to a remote deposition and were entitled

to demand Mr. Cervinka's presence under the longstanding policy that "a plaintiff who chooses

this district as his forum" must "appear for deposition in this forum absent compelling

circumstances."  Barbet Decl. Ex. 1 at 5 (quoting *MPD Accessories B.V. v. Target Corp.*, 2013

WL 1200359, at *1 (S.D.N.Y. Mar. 1, 2013)).  Defendants asked Plaintiff to confirm that Mr.

Cervinka would appear in New York on July 10—or, if he was not available that day,

Defendants offered to confer on "another mutually workable date" for a deposition in New York.

*Id.*  Plaintiff's counsel responded that Defendants' "feigned need for in person [was] a self-

inflicted injury" and that Plaintiff was "prepared to proceed by zoom." *Id.* at 4.  On July 2,

Defendants reiterated that "black-letter law require[s] Plaintiff to produce its CEO in person in

New York" and indicated that they would pursue Rule 37(d) sanctions if Mr. Cervinka failed to appear in person. *Id.* at 1.

On the evening of July 3, Defendants noticed Mr. Cervinka's continued deposition for July 10 in New York. Barbet Decl. Ex. 3. Plaintiff responded, on July 5, that Mr. Cervinka was "unavailable for an in-person deposition" but was "available remotely for his continued virtual deposition on July 10." Barbet Decl. Ex. 2 at 2-3. In response, Defendants reiterated their intention to proceed in person and their entitlement to do so under "black-letter law." *Id.* at 1. On July 8, Plaintiff filed an emergency letter-motion to quash the in-person deposition. *See* Letter-Mot. to Quash July 10 Dep., ECF No. 95. On July 10, Plaintiff's counsel appeared at Defendants' office for the deposition with laptop in hand, ready to begin the deposition virtually. Second Herrmann Decl. ¶ 14. Defendants' counsel declined to take the deposition, noting that they "did not consent to a remote deposition and [would] not proceed with a remote deposition." *Id.* Ex. 3 at 9.

On July 16, the Court denied Plaintiff's motion to quash, holding that Plaintiff had failed to identify any compelling circumstances that would make traveling to New York unduly burdensome for Mr. Cervinka. *See* Order of July 16 at 2-3, ECF No. 103. The Court ordered the parties to meet and confer in good faith to find a mutually agreeable date to depose Mr. Cervinka in person. *Id.* at 3. The parties eventually agreed on an in-person deposition on August 30. *See* Barbet Decl. Ex. 5.

### 2. Legal Standards

Rule 37(d) provides the governing standard for the imposition of sanctions when a party fails to attend its own deposition. It states that "[t]he court where the action is pending may, on motion, order sanctions if . . . a party or a party's officer, director, or managing agent . . . fails, after being served with proper notice, to appear for that person's deposition." Fed. R. Civ. P.

37(d)(1)(A), (A)(i).  Such sanctions "may include," *inter alia*, prohibiting the disobedient party from introducing certain evidence, striking pleadings in whole or in part, staying proceedings, or dismissing the action.  Fed. R. Civ. P. 37(d)(3) (referencing Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi)). "Instead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  *Id.*  A failure to appear "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)."  Fed. R. Civ. P. 37(d)(2).

Rule 37(d)(3) "place[s] the burden on the disobedient party to avoid expenses by showing that his failure is justified or that special circumstances make an award of expenses unjust." *Novak v. Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008) (quoting Advisory Committee Note to 1970 Amendments to Fed R. Civ. P. 37).  "Moreover, courts and commentators alike have held that the provision 'requires the award of expenses' unless the disobedient party meets that burden."  *Id.*  "Conduct is substantially justified if there was a genuine dispute or if reasonable people could differ as to the appropriateness of the contested action."  *Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 442 (S.D.N.Y. 2013). "Reasonable fees may include attorney's fees and costs in connection with filing a motion for sanctions."  *Burks v. Stickney*, 837 F. App'x 829, 832-33 (2d Cir. 2020) (citing *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 145, 151 (S.D.N.Y. 2014)).

A party's failure to appear for its own deposition can also "justify the imposition of sanctions pursuant to the court's inherent power to impose sanctions against parties and their counsel who abuse the litigation process."  *Blauinsel Stiftung v. Sumitomo Corp.*, No. 99 Civ. 1108, 2001 WL 1602118, at *8 (S.D.N.Y. Dec. 14, 2001) (citing *Chambers v. NASCO, Inc.*, 501

U.S. 32, 43-45 (1991)).  Inherent-power sanctions "may be imposed . . . to sanction a party's misconduct during the course of litigation . . . where a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Id.* (quoting *Chambers*, 501 U.S. at 45-46).  "Because of their very potency, inherent powers must be exercised with restraint and discretion."  *Chambers*, 501 U.S. at 44.

### 3.  Whether Sanctions Are Warranted

Under Rule 37(d), Defendants seek an award of expenses and attorney's fees, jointly and severally against Plaintiff and its counsel, incurred in preparation for the May 7 and July 10 depositions, as well as in preparation of the two Motions for Sanctions.  *See* Defs.' Mem. Supp. First Mot. Sanctions ("First Sanctions Mem.") 12, 20, ECF No. 79; Defs.' Mem. Supp. Second Mot. Sanctions ("Second Sanctions Mem.") 14, 17-18, ECF No. 114.  Additionally, Defendants seek sanctions against Plaintiff's counsel under the Court's inherent authority for "vexatious and oppressive litigation practices" in connection with the motion to quash the July 10 in-person deposition.  Second Sanctions Mem. 12-13, 18.

Plaintiff argues that the Court should not impose sanctions because Mr. Cervinka did, in fact, appear for both depositions—he appeared for the May 7 deposition "within three days" and appeared for the July 10 deposition "virtually."  Pl.'s Opp. First Mot. Sanctions ("First Sanctions Opp.") 7, ECF No. 99; Pl.'s Opp. Second Mot. Sanctions ("Second Sanctions Opp.") 10, ECF No. 119.  Moreover, Plaintiff argues that the three-day adjournment in May and the virtual appearance in July were "substantially justified."  First Sanctions Opp. 7-9; Second Sanctions Opp. 9-11.  Plaintiff further argues that inherent authority sanctions are not justified because Plaintiff at all times acted in good faith.  Second Sanctions Opp. 12-14.

*a. Rule 37(d) Sanctions for the May 7 Deposition*

Plaintiff first argues that Mr. Cervinka did not fail to appear within the meaning of Rule 37(d). "Failure to appear is strictly construed in this Circuit and only occurs where a deponent literally fails to show up for a deposition session." *Salahuddin v. Harris*, 782 F.2d 1127, 1131 (2d Cir. 1986). Plaintiff argues that Mr. Cervinka "*did* appear for his deposition within three days of the unilaterally noticed date (May 7, 2024), which did not work for Cerco's counsel," and he then "appeared again for his deposition (remotely) on July 10, 2024." First Sanctions Opp. 7. Thus, according to Plaintiff, "[t]his was in no way a 'no show'" because "Cervinka appeared *twice*." *Id.* Plaintiff's argument strains credulity. The deposition was formally noticed for May 7, 2024, and Cervika did not show up—he "literally fail[ed] to show up for a deposition" on that day, *Salahuddin*, 782 F.2d at 1131. His later appearance on other dates does nothing to change that fact. Accordingly, the burden is on Plaintiff to show that Mr. Cervinka's failure to appear on May 7 was substantially justified. *See Novak*, 536 F.3d at 178.

Plaintiff argues that "the short adjournment, from May 7 to May 10, 2024, was substantially justified, given counsel's unavailability and the Court's decision on the application to quash." First Sanctions Opp. 7. This argument, too, falls flat. First, the deposition was noticed on April 25, but counsel for Plaintiff failed to respond to the April 25 notice indicating their unavailability until May 3—two business days before the deposition.[7] *See* First Herrmann

---

[7] Plaintiff's repeated references to the "unilaterally noticed" deposition date, *see* First Sanctions Opp. 3, 4, 6, 7, 8, 9, are baffling in light of the evidence that Defendants consulted with Plaintiff about the May 7 date beginning on April 19 and only proceeded to notice the deposition for that date once they had received no clear response by April 25. *See* First Herrmann Decl. Ex. 3 at 3; *id.* ¶ 5. Though it is true that Defendants' April 25 notice was filed "right after Cerco informed Defendants that we were available to meet and confer to discuss depositions," Pollock Decl. ¶ 4, ECF No. 100, Plaintiff's proposed meet-and-confer date was April 30, *id.* Ex. 1 at 2, five days later and just one week before the tentative deposition. Defendants, having proposed several dates after Plaintiff initially rejected May 3, were entitled

Decl. ¶ 5; *id.* Ex. 5 at 2.  Moreover, counsel provided no explanation for the purported

unavailability and did not specify whether it was counsel or the witness who was unavailable.[8]

*See id.*  Even more fatal to Plaintiff's argument is that "counsel's unavailability" was not the

basis for their motion to quash.  Plaintiff instead asked the Court to quash the deposition on the

grounds that it would constitute improper jurisdictional discovery and discovery of extrinsic

evidence.  *See* Letter-Mot. to Quash May 7 Dep., ECF No. 51.  These were the only grounds for

refusing to produce Mr. Cervinka that Plaintiff actually raised with the Court, and the Court

rejected them before the deposition.  *See* Order Denying Mot. to Quash.  Plaintiff provides no

justification, let alone a substantial justification, for its failure to produce Mr. Cervinka on May

7.

Finally, Plaintiff argues that an award of attorney's fees would be "manifestly unjust,

given that Cerco acted in good faith at all times and attempted to work with Defendants

regarding the deposition's scheduling, and that the brief adjournment was necessary and

substantially justified."  First Sanctions Opp. 9.  The Court has already rejected the argument that

Plaintiff's actions were substantially justified.  As for good faith, "[i]t is well-established . . . that

a party applying for sanctions under Rule 37(d) is not required to prove that the party who failed

to attend the deposition acted in bad faith."  *John Wiley & Sons, Inc. v. Book Dog Books, LLC*,

298 F.R.D. 145, 149 (S.D.N.Y. 2014).  Regardless, the record does not reveal that Plaintiff

---

to notice the deposition for May 7 after inquiring about Plaintiff's availability and hearing no clear response.

[8] Plaintiff's assertion that counsel "promptly (and repeatedly) communicated that unavailability to Defendants' counsel," First Sanctions Opp. 8, is belied by the submissions of both parties, which indicate that counsel first mentioned lack of availability on the afternoon of May 3.  *See* First Herrmann Decl. ¶ 11; *id.* Ex. 5 at 2; Pollock Decl. ¶ 6; *id.* Ex. 3 at 2.  On May 6, Plaintiff's counsel stated repeatedly that he would not be producing the witness the following day, but he gave no explanation for that refusal (nor did he attribute it to unavailability).  *See* First Herrmann Decl. Ex. 6 at 1-2.

worked with Defendants in good faith on the scheduling of the deposition.  Plaintiff was

uncommunicative and evasive about its availability right up until the eve of the deposition—

indeed, to this day, Plaintiff has failed to provide Defendants or the Court any explanation for its

purported unavailability.

Accordingly, because Plaintiff has failed to show substantial justification for its actions

or that imposing sanctions would be otherwise unjust, the Court will award Defendants

reasonable expenses caused by Mr. Cervinka's failure to attend the May 7 deposition.

### b. Rule 37(d) Sanctions for the July 10 Deposition

Plaintiff argues that Mr. Cervinka's virtual appearance at the July 10 deposition was not

literally a failure to appear and, in any event, it was substantially justified "given the

untimeliness of Defendants [sic] notice of deposition coupled with Mr. Cervinka's international

travel and Cerco's pending application to quash."  Second Sanctions Opp. 9.  Plaintiff's

arguments are unpersuasive.  Plaintiff cites no authority for the proposition that a deponent may

unilaterally decide to appear remotely for a deposition that was noticed to take place in person.

Rather, Rule 30(b)(4) provides that a deposition may be taken remotely by stipulation of the

parties or order of the court—neither of which was present here.  *See* Fed. R. Civ. P. 30(b)(4).

Nor was the fact that Mr. Cervinka was not in the United States a sufficient excuse for his failure

to appear in New York.  As this Court has already explained, "[c]ourts in this District have 'long

enunciated the policy of requiring a . . . plaintiff who chooses this district as his forum to appear

for deposition in this forum absent compelling circumstances."  Order of July 16 at 2 (quoting

*MPD Accessories B.V. v. Target Corp.*, 2013 WL 1200359, at *1 (S.D.N.Y. Mar. 1, 2013)).

Plaintiff cites international travel as a reason Mr. Cervinka was not produced in person, *see*

Second Sanctions Opp. 9, but international travel, by itself, is not a sufficiently compelling

circumstance, at least in this case.  Moreover, the pending motion to quash was not a motion for

a protective order and therefore did not stay Plaintiff's obligation to produce Mr. Cervinka in person.  *See* Fed. R. Civ. P. 37(d)(2) (failure to appear "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)").

That leaves the timing of Defendants' notice of deposition.  Plaintiff contends that the notice on July 3 of a deposition on July 10 was unreasonable under Rule 30(b)(1), given the intervening holiday and weekend.  *See* Second Sanctions Opp. 9-10; Fed. R. Civ. P. 30(b)(1) ("A party who wants to depose a person by oral questions must give reasonable written notice to every other party.").  But Rule 30(b)(1) does not prescribe any minimum notice period, and "the reasonableness of notice must be determined in light of the facts and circumstances of the individual case." *Fu v. Consol. Edison Co. of N.Y.*, 2018 WL 4373995, at *5 (S.D.N.Y. Sept. 13, 2018).  Here, Defendants were diligent in their efforts to reschedule the deposition, requesting Mr. Cervinka's availability on May 22.  Second Herrmann Decl. ¶ 4.  Plaintiff, however, did not respond until June 21—and it was not until June 26 that Plaintiff informed Defendants it would agree only to a remote deposition.  *Id.* ¶¶ 4-5.  By June 28, at the latest, Plaintiff was aware that Defendants insisted on taking Mr. Cervinka's deposition on July 10—the only date Plaintiffs had offered—in New York.  *See* Barbet Decl. Ex. 1 at 5.  Defendants' slight delay in formally noticing the deposition does not provide substantial justification for Mr. Cervinka's failure to appear.  The Court finds that the notice here was reasonable under the circumstances. *See, e.g.*, *F.A.A. v. Landy*, 705 F.2d 624, 634 (2d Cir. 1983) (holding that four days' notice was reasonable on the facts of the case).

Plaintiff also argues that an award of attorney's fees would be unjust because "this dispute could have been avoided in its entirety had Defendants promptly noticed Mr. Cervinka's deposition."  Second Sanctions Opp. at 12.  As discussed above, however, Plaintiff knew that

Defendant insisted on taking the deposition on July 10 in New York at least two weeks in advance of that date.  Having dragged its feet in scheduling the July deposition, Plaintiff cannot now cite untimeliness to excuse its noncompliance.  In any event, it is unclear how the dispute would have been avoided if Defendants had noticed the deposition earlier.  To the extent that Plaintiff suggests it might have filed its motion to quash in time for the Court to rule on the motion before the scheduled deposition, the events of May do not inspire confidence that a denial of Plaintiff's motion to quash would have induced Mr. Cervinka's attendance.

Plaintiff has not demonstrated substantial justification for Mr. Cervinka's failure to attend the July 10 deposition in person, or that imposing sanctions would be otherwise unjust. Accordingly, the Court will award Defendants reasonable expenses caused by that failure.

 *c.* *Inherent Power Sanctions*

Finally, Defendants seek a separate award of sanctions under the Court's inherent authority "in light of counsel's repeated acts of vexatious and oppressive discovery misconduct." Second Sanctions Mem. 2.  Although the Court is sympathetic to Defendants' concerns, the Court finds that an award of reasonable expenses is sufficient to compensate Defendants and to deter Plaintiff from future misconduct.  Because the Court's inherent powers "must be exercised with restraint and discretion," *Chambers*, 501 U.S. at 44, the Court declines to impose additional sanctions under its inherent powers.[9]

### 4. Calculation of Award

The starting point for determining a reasonable fee award is the "lodestar" or "presumptively reasonable fee," which is "the product of a reasonable hourly rate and the reasonable number of hours required by the case."  *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154,

---

[9] The Court also denies as moot Defendants' request for sanctions in the form of a discovery stay.  *See* First Sanctions Mem. 19.

166 (2d Cir. 2011).  Reasonable fees compensate counsel only for "hours reasonably expended

on the litigation," and not for "hours that are excessive, redundant, or otherwise unnecessary."

*Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983).  A reasonable hourly rate is "the rate a

paying client would be willing to pay."  *Arbor Hill Concerned Citizens Neighborhood Ass'n v.

Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008).  In setting a reasonable hourly rate, courts

consider case-specific variables known as the *Johnson* factors.  *Id.* at 190.  The *Johnson* factors

are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3)
> the level of skill required to perform the legal service properly; (4) the preclusion
> of employment by the attorney due to acceptance of the case; (5) the attorney's
> customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time
> limitations imposed by the client or the circumstances; (8) the amount involved in
> the case and the results obtained; (9) the experience, reputation, and ability of the
> attorneys; (10) the "undesirability" of the case; (11) the nature and length of the
> professional relationship with the client; and (12) awards in similar cases.

*Id.* at 186 n.3.  As its name suggests, the presumptively reasonable fee is not "conclusive in all

circumstances," and it may be adjusted when it fails to "adequately take into account a factor that

may properly be considered in determining a reasonable fee."  *Millea* 658 F.3d at 167.

"A district court should of course review any fee request," but courts have an

"independent obligation to scrutinize a fee petition in limited circumstances, typically in

situations implicating concerns regarding the adversarial process" such as class-action

settlements and bankruptcy determinations.  *United States v. Nursing Pers. Home Care*, 794 F.3d

232, 236 (2d Cir. 2015).  Absent those special circumstances, when "a fee target has failed to

offer either countervailing evidence or persuasive argumentation in support of its position, . . . it

is [not] the district court's job either to do the target's homework or to take heroic measures

aimed at salvaging the target from the predictable consequences of self-indulgent lassitude."  *Id.*

Here, Defendants seek to recover $75,368.50[10] in attorney's fees and $7,561.35 in costs in connection with the May 7 deposition, *see* First Herrmann Decl. Ex. 18 at 1, 7, and $34,963.00 in attorney's fees and $5,773.03[11] in costs in connection with the July 10 deposition, *see* Second Herrmann Decl. Ex. 4 at 1-3. The Court will address the fees and costs in turn.

    *a. Defendants' Proposed Fee Award*

Defendants' requested fees cover work undertaken by Defendants' counsel, Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), in connection with:

- Opposing Plaintiff's efforts to quash the May 7 deposition;

- Preparing for the deposition that did not proceed on May 7 as scheduled;

- Remonstrating with Plaintiff's counsel in an effort to secure Plaintiff's compliance with its discovery obligations leading up to the May 7 deposition;

- Preparing a pre-motion letter seeking permission to move for sanctions in connection with the May 7 deposition;

- Opposing Plaintiff's motion to quash the July 10 in-person deposition; and

- Preparing for the deposition that did not proceed on July 10 as scheduled.

---

[10] In a table attached to their declaration, Defendants state that they request a total of $118,092.50 in attorney's fees in connection with the May 7 deposition. *See* First Herrmann Decl. Ex. 18 at 1. But that sum appears to reflect two errors in Defendants' tabulation of the fee award. First, the sum of the figures in the "Requested Fees" column is $121,156.50, not $118,092.50—reflecting an undercounting of $3,064. *See id.* at 1, 2. Second, the sum is significantly inflated by a typographical error in the table. In requesting fees for James Fogelman's work of 2.5 hours at a rate of $2,035 per hour on May 6, 2024, Defendants entered the figure "$5,0875.50" (i.e., more than fifty thousand dollars) instead of $5,087.50 (around five thousand dollars). *See id.* at 2. These two errors account for the discrepancy of $42,724 between Defendants' calculation ($118,092.50) and the Court's calculation ($75,368.50) of the total fees requested for the May 7 deposition.

[11] Defendants state that they request $5,773.96 in costs. *See* Second Herrmann Decl. Ex. 4 at 3. However, that appears to reflect a minor mathematical error—the sum of the costs listed in Defendants' table of costs is $5,773.03. *See id.*

First Herrmann Decl. ¶ 26; Second Herrmann Decl. ¶ 22. Defendants' requested fees are based on a total of 81.4 hours of work[12] performed by attorneys whose hourly billing rates range from $845 for a junior associate to $2,035 for a partner with more than 30 years' experience in real-estate and other commercial litigation. First Herrmann Decl. ¶ 24; *id.* Ex. 18; Second Herrmann Decl. Ex. 4.

Plaintiff does not mount a full challenge to the reasonableness of Defendants' proposed fee recovery. Notably, Plaintiff does not take any issue with the reasonableness of Gibson Dunn's hourly rates. *See* First Sanctions Opp.; Second Sanctions Opp. But Plaintiff does briefly challenge some of the categories of fees that Defendants seek to recover. Specifically, Plaintiff argues that time spent preparing for the May 7 deposition was not wasted because the deposition occurred three days later, and that time spent preparing for the July 10 deposition was not wasted because the deposition was later rescheduled for August 30. Additionally, although it does not appear to connect this argument to the fee recovery, Plaintiff argues in passing that it acted in good faith with respect to the two motions to quash. The Court considers each of Plaintiff's arguments in turn.

First, Plaintiff argues that "any time Defendants' counsel spent preparing for the deposition on May 7 was not wasted" because Defendants "used that preparation in connection with the May 10 deposition just days later." First Sanctions Opp. 9-10. This argument is best understood as a challenge to the reasonableness of the number of hours claimed by Defendants—or, put differently, an argument that those expended hours were not "caused by" Mr. Cervinka's failure to appear, Fed. R. Civ. P. 37(d)(3), because they would have been incurred eventually anyway. Indeed, Defendants acknowledge that some of their deposition preparation for May 7

---

[12] After accounting for Defendants' proposed discounts, discussed below, Defendants request recovery for a total of 61.85 hours.

would—albeit to a "significantly limited" extent—be "useful whenever the second half" of the deposition took place.  First Sanctions Mem. 19 n.6.  Accordingly, they seek 50 percent of the number of hours spent in deposition preparation "in recognition of the fact that 'cancellation of the deposition means that defendants' counsel will have to repeat some of their preparation in advance of a rescheduled deposition.'"  *Id.* (quoting *Sang Lan v. Time Warner, Inc.*, No. 11 Civ. 2870, 2015 WL 2078385, at *1 (S.D.N.Y. May 4, 2015)); *see also* First Herrmann Decl. ¶ 27.

Ultimately, the Court finds that a more significant discount than what Defendants propose is appropriate here because much of Defendants' preparation was ultimately useful on May 10.  The Court finds that it is reasonable for Defendants to recover for 25 percent of the time spent on deposition preparation in May.  *Cf. Sang Lan*, 2015 WL 2078385, at *1 (awarding 30 percent of preparation time for cancelled deposition).

Second, Plaintiff also argues that "any time Defendants' counsel spent preparing for the deposition on July 10 was not wasted, as it has since been rescheduled to August 30."  Second Sanctions Opp. 12.  Defendants recognized this point in principle and accordingly discounted their time in preparation for the May deposition, but they do not appear to have done the same in their accounting for the July deposition.  *See* Second Herrmann Decl. Ex. 4.  Defendants provide no explanation for this discrepancy.  In light of the discussion above regarding the May deposition, the Court applies the same discount here and will award Defendants recovery for 25 percent of the hours spent in preparation for the July 10 deposition.

Finally, Defendants seek to recover fees for time spent reviewing and responding to Plaintiffs' two unsuccessful motions to quash, arguing that those motions were "frivolous."  *See, e.g.*, First Sanctions Mem. 12; Second Sanctions Mem. 12.  Plaintiff does not directly challenge Defendants' request for fees relating to the motions to quash, but it does insist that it filed those motions in good faith.  *See* First Sanctions Opp. 12 (arguing that "there was a genuine dispute

regarding whether the March 11, 2024 Order precluded Mr. Cervinka's deposition"); Second
Sanctions Opp. 6 (arguing it had a "good faith basis to believe that the Court would allow Mr.
Cervinka's deposition to proceed virtually").  The Court finds that Defendants should be
reimbursed for the fees incurred in opposing the motions to quash because that work "would not
have been necessary" had Plaintiff and its counsel "conducted themselves properly in the
discovery process."  *Creative Res. Grp. of N.J., Inc. v. Creative Res. Grp., Inc.*, 212 F.R.D. 94,
104 (E.D.N.Y. 2002).  Plaintiff's conduct in the lead-up to both motions suggests that it never
intended to produce Mr. Cervinka in person on May 7 or July 10—regardless of the Court's
decision on the motions.  Rather, Plaintiff appears to have been using the pendency of the
motions as an excuse to adjourn the depositions.  Plaintiff's attempt to delay the depositions was
not substantially justified, as there was no genuine dispute as to the merits of either motion to
quash.  *See Klein*, 979 F. Supp. 2d at 442.  Accordingly, the expenses Defendants incurred in
opposing the motions are attributable to Plaintiff's decision not to produce Mr. Cervinka on May
7 and July 10 and will be included in the fee award.

Having considered Plaintiff's arguments and the *Johnson* factors, the Court finds that the
number of hours requested by Defendants, adjusted as discussed above, is reasonable.  Because
Plaintiff does not challenge the reasonableness of Gibson Dunn's billing rates or attorney
staffing decisions, the Court declines to "do [Plaintiff's] homework," *Nursing*, 794 F.3d at 236,
and independently scrutinize the claimed hourly rates.  Defendants have submitted a sworn
declaration stating that the proposed fees represent Gibson Dunn's customary hourly rates, which
are "commensurate with the rates charged by several other premier, full-service firms actively
involved in commercial litigation matters in the Southern District of New York."  First
Herrmann Decl. ¶ 25.  Plaintiff had ample opportunity to contest those rates in either of its two
briefs opposing sanctions—indeed, Defendants even pointed out in their first reply brief that

Plaintiff had "fail[ed] to contest" the "reasonableness of" its proposed monetary award, First Sanctions Reply 6, ECF No. 107—but it did not do so. Given that Plaintiff essentially concedes the reasonableness of the rates for Defendants' counsel, the Court assumes their rates are reasonable. *See Nursing*, 794 F.3d at 236.[13]

In sum, the Court awards reasonable attorney's fees as described in Tables 1 and 2.

**Table 1. Fees Awarded in Connection with the May 7, 2024 Deposition**[14]

| Category | Hours | Requested Fees | Percent Awarded | **Awarded Fees** |
|---|---|---|---|---|
| Expenses incurred in preparing for the adjourned deposition | 39.1 | $32,497.50[15] | 50% | $16,248.75 |
| Other expenses, including those incurred in opposing the motion to quash | 22.3 | $42,871.00[16] | 100% | $42,871.00 |
| Total | 61.4 | $75,368.50 | | **$59,119.75** |

**Table 2. Fees Awarded in Connection with the July 10, 2024 Deposition**[17]

| Category | Hours | Requested Fees | Percent Awarded | **Awarded Fees** |
|---|---|---|---|---|
| Expenses incurred in preparing for the adjourned deposition | 9 | $16,660.00 | 25% | $4,165.00 |
| Other expenses, including those incurred in opposing the motion to quash | 11 | $18,303.00 | 100% | $18,303.00 |
| Total | 20 | $34,963.00 | | **$22,468.00** |

---

[13] The Court notes that the rates awarded here are not wholly inconsistent with what other courts have awarded. *See, e.g.*, *Roma Landmark Theaters, LLC v. Cohen Exhibition Co.*, 2021 WL 5174088, at *5-*6 (Del. Ch. Nov. 8, 2021) (approving a Gibson Dunn partner's hourly rate of $1,645 in November 2021, which translates to approximately $1,880 in January 2025, the latest month for which the U.S. Department of Labor's CPI Inflation Calculator has available data, *see* U.S. Dep't of Labor, U.S. Bureau of Labor Statistics, CPI Inflation Calendar, *available at* https://www.bls.gov/data/inflation_calculator.htm).

[14] *See* First Herrmann Decl. Ex. 18.

[15] This figure already represents the 50 percent discount proposed by Defendants.

[16] This figure accounts for Defendants' calculation errors with respect to (1) James Fogelman's requested fees of "$5,0875.50" on May 6, 2024 and (2) the summation of their requested fees. *See supra* n.10.

[17] *See* Second Herrmann Decl. Ex. 4.

*b.  Defendants' Proposed Costs*

In addition to attorney's fees, Defendants request reimbursement for the following costs:

- Airfare and lodging costs in connection with Mr. Fogelman's travel from Los Angeles to New York on May 6, 2024 for the deposition that did not take place on May 7, 2024;

- Court reporter and videographer cancellation fees incurred for failing to cancel before 4:00 p.m. on the day before the May 7 deposition;

- Airfare and lodging costs in connection with Mr. Kahn's travel from San Francisco to New York for the purpose of, inter alia, conducting the deposition on July 10, 2024;[18]

- Court reporter and videographer cancellation fees incurred in connection with the July 10 deposition; and

- Costs associated with Westlaw research in connection with the legal work described above.

First Herrmann Decl. ¶¶ 28, 30-32; Second Herrmann Decl. ¶¶ 23, 25, 26.  Plaintiff contends that "imposing sanctions for the court reporter and videographer fees and counsel's travel fees would be unjust because Cerco gave advance and reasonable notice of its unavailability on May 7." First Sanctions Opp. 10.  As the Court has already discussed, however, Plaintiff did not give clear advance notice of its unavailability.  Defendants could well have interpreted Plaintiff's vague "We are not available" statement on May 3, First Herrmann Decl. Ex. 5 at 2, as "an act of gamesmanship," *John Wiley & Sons, Inc.*, 298 F.R.D. at 150-51, especially given that "counsel's unavailability" was not the basis for Plaintiff's motion to quash.  Moreover, the Court could have denied Plaintiff's motion to quash at any moment and ordered the deposition to go forward.  It was therefore reasonable for Defendants to proceed under the assumption that the deposition

---

[18] In his declaration, Mr. Herrmann mentions a deposition date of May 10, 2024, but the Court understands him to be referring to the July 10, 2024 deposition.  *See* Second Herrmann Decl. ¶ 23.

would occur as noticed.[19]  Accordingly, the Court approves an award for Defendants' costs in

connection with travel, lodging, and court reporter and videographer cancellation fees.  The

Court also grants the application to recover Westlaw research costs, which Plaintiff does not

contest.

In sum, the Court awards $7,561.35 in costs in connection with the May 7 deposition and

$5,773.03 in costs in connection with the July 10 deposition.  *See* First Herrmann Decl. Ex. 18 at

7; Second Herrmann Decl. Ex. 4 at 3.

c.  *Whether Plaintiff and Plaintiff's Former Counsel are Jointly and Severally Liable*

Defendants seek sanctions "jointly and severally" against Cerco and its (now former)

counsel, Fox Rothschild.  First Sanctions Mem. 20; Second Sanctions Mem. 17; *see* Fed. R. Civ.

P. 37(d)(3) (expenses are to be paid by "the party failing to act, the attorney advising that party,

or both").  However, Plaintiff maintains that Mr. Cervinka's failure to attend the May 7

deposition was attributable to "counsel's unavailability."  First Sanctions Opp. 7, 9; *see also id.*

at 8.  Cerco should not be held responsible for a decision that appears to have been based on

*counsel*'s unwillingness or inability to attend the duly noticed deposition.  Accordingly, the

Court concludes that the sanctions in connection with the May 7, 2024 deposition ($59,119.75 in

fees plus $7,561.35 in costs) should be charged against Fox Rothschild.  Meanwhile, Mr.

Cervinka's failure to appear in person for the July 10 deposition appears to have been due to his

own unwillingness to travel from Europe to New York to be deposed in connection with a

lawsuit that his company initiated in the Southern District of New York.  The Court therefore

holds that the sanctions in connection with the July 10, 2024 deposition ($22,468.00 in fees plus

$5,773.03 in costs) should be charged against Cerco.

---

[19] Plaintiff does not make the same argument as to the July 10 deposition, but the same
reasoning would apply.

    *d. Defendants' Request for Fees on Fees*

Finally, Defendants seek leave to submit their additional expenses and fees incurred in preparing the two motions for sanctions. *See* First Sanctions Mem. 20; Second Sanctions Mem. 17-18. Any supplemental "fees on fees" application faces the complication that Plaintiff is currently uncounseled, and both Plaintiff and Fox Rothschild must be given the opportunity to respond. By **March 19, 2025**, Defendants are directed to meet and confer with the relevant parties and, if Defendants still wish to submit a supplemental application, to propose to the Court a briefing schedule that gives Plaintiff time to obtain new counsel in connection with the supplemental fee application.

## CONCLUSION

Defendants' Motion to Dismiss is **GRANTED**; the First Amended Complaint is hereby dismissed with prejudice. Plaintiff's Cross-Motion for Partial Summary Judgment is **DENIED**. Defendants' Motions for Discovery Sanctions are **GRANTED IN PART**. The Clerk of Court is respectfully directed to terminate ECF Nos. 39, 45, 46, 78 & 113. All other pending motions are moot.


    SO ORDERED.

Dated: February 26, 2025
      New York, New York

                                     DALE E. HO
                           United States District Judge